A90A0336. FULTON-DeKALB HOSPITAL AUTHORITY v. FANNING.
(396 SE2d 534)

BEASLEY, Judge.

Fanning, as administratrix of her father's estate, sued the hospital authority ("Grady") for allegedly negligent medical care and treatment of the decedent. Grady moved for summary judgment, supported by the affidavit of a physician attesting to the level of care and treatment provided. In a supplemental motion Grady advanced the charitable immunity defense (initially asserted in its answer) as a basis for summary judgment. The trial court denied summary judgment, and this court denied an interlocutory appeal.

In a bifurcated proceeding as to decedent's status as a charity patient vel non, the jury, after being instructed that Grady had the burden of proving the decedent's charitable status, found that Grady had not met this burden. The trial court reiterated its previous denial of summary judgment. Grady again sought interlocutory appeal. It was granted to examine the issues of the decedent's status in the light of recent decisions and to determine whether the burden of proof was properly allocated.

1. As a charitable institution Grady is generally entitled to the

defense of charitable immunity. *Ponder v. Fulton-DeKalb Hosp. Auth.*, 256 Ga. 833, 834 (353 SE2d 515) (1987); *Morton v. Savannah Hosp.*, 148 Ga. 438 (96 SE 887) (1918). "There is an exception to this general rule[, however]: a charitable hospital may be liable for negligence to a *paying patient. . . .*" (Emphasis supplied.) *Ponder*, supra at 834, citing *Morton*; accord *Fulton-DeKalb Hosp. Auth. v. Alexander*, 193 Ga. App. 505 (388 SE2d 372) (1989); *Patterson v. Fulton-DeKalb Hosp. Auth.*, 192 Ga. App. 167 (384 SE2d 205) (1989).

The services rendered decedent were worth some $5,600, including current charges of $52.45 and about $5,500 for emergency psychiatric services rendered some months previously. Grady never requires payment for emergency psychiatric treatment regardless of the patient's financial status, so only the $52.45 figures here. None of these charges was paid, either by decedent's administratrix, by insurance, or otherwise.

As to decedent's financial capacity to pay the bills, the Director of Patient Investigations (the unit responsible for determining financial eligibility for free or low-cost treatment) testified that the "X" rating assigned decedent on his first admission indicated one of two statuses: (1) ineligibility for a discount or (2) inability to verify income at time of admission. She further testified that the "40" on his admission record indicated he had stated that he had insurance. Grady billed the insurer named by decedent for $52.45, but payment was declined for reasons not stated in the record. Grady never billed the estate. The line on decedent's admission record captioned "Insurance verified" bears the handwritten notation, "No Ins." The same notation appears in the upper left-hand corner of two of the three otherwise identical copies of the filled-in form contained in the record. A computer-generated statement dated July 26, 1985, and marked "Transfer to Attorney," shows itemized charges for June 2, 1985, of $15 for electrocardiology and $37.45 for laboratory work, a total of $52.45.

The witness further testified that, unlike most other hospitals, Grady does not require "up front" payment at the time of admission and that, consequently, *all* rankings on the financial eligibility scale at admission are necessarily tentative until the Patient Investigations staff can verify the data provided. She also stated that, according to Grady's records, decedent had no savings account and his checking account contained less than $100.

Grady produced evidence that at the time of decedent's psychiatric admission he had stated that he earned $200 — $400 per week but had recently earned less than that. Grady also produced evidence that, although decedent owned a house and an automobile, IRS income tax information showed that he filed no return for 1981 through 1983 and that 1984's return indicated gross income of $4,545, with

one dependent.

Grady contends in its fourth enumeration of error that the jury's verdict should be set aside and the denial of summary judgment reversed because the trial court improperly assigned to Grady the burden of proving that decedent was not a "paying patient" but a "charity patient." Under OCGA § 24-4-1, "[t]he burden of proof generally lies upon the party who is asserting or affirming a fact and to the existence of whose case or defense the proof of such fact is essential." Where the defendant asserts an affirmative defense (here, that decedent did not come within the "paying patient" exception to the charitable immunity rule but was a charity patient instead), the burden of establishing such a defense is on the party asserting it. *Pembrook Mgmt. v. Cossaboon*, 157 Ga. App. 675 (278 SE2d 100) (1981); *Parsons v. Harrison*, 133 Ga. App. 280 (211 SE2d 128) (1974).

However, where the opposing party has access to and control over most or all of the evidence necessary to prove or disprove an issue raised as an affirmative defense, the burden may be allocated to that party rather than to the party who raised the defense. The trial judge has discretion to reassign the burden of going forward, once a certain quantum of evidence has been adduced by the party who technically had the burden.

Many cases since *Morton* refer to it in considering whether a particular plaintiff is a charity patient or not. *Morton* does not define what is a charity patient, a patient whose care is paid for by the public because he or she is indigent and for this reason unable to pay. *Morton* is a case in which the Supreme Court simply answered six questions certified to it by the Court of Appeals.

One of the questions set up a hypothetical case and asked in effect whether the hospital would be immune from suit by such a patient (with one exception not at issue here). The facts posited were that the person received as a patient was able to pay and did pay for board, medical attention, and other services and suffered injuries due to the carelessness, negligence, or incompetence of a nurse or servant of the hospital. The Court answered that question, saying that the hospital was not immune from suit by "such non-charitable pay patients," limited to certain funds. Id. at 441.

It did not define the other side of the coin, charity patients, nor designate factors which would identify one as a charity patient for non-liability purposes. It did not describe the category "charity patients" nor even fully describe the universe of non-charity patients. A patient who is able to pay but simply refuses to do so is not a "charity patient." The costs for his care constitute a bad debt, not a charitable benefit underwritten by a willing public. Nor may a patient who may himself be unable to pay and thus be in effect an indigent person, but whose total expenses are paid from some other source, be categorized

as a charity patient. The reason is that the costs for his care are not borne by the public as an expression of charity. Compare *Patterson v. Fulton-DeKalb Hosp. Auth.*, 192 Ga. App. 167, 168 (384 SE2d 205) (1989), where *partial* payment made by insurance did not remove the patient from the charity category. What was crucial was that the patient "was admitted without any agreement to pay for the services to be rendered and that he does not have assets sufficient to pay for the services. . . ."

If a person qualified for free or reduced-rate medical care which is paid for (in whole or in part) by the charitable trust fund, then he is a "charity patient" against whom the immunity may be asserted so as to protect those charitable funds from depletion by a recovery for damages for negligence, so that they can be devoted to the purpose intended by the public which dedicated and supplied them, i.e., the treatment of other charity patients as well. *Ponder v. Fulton-DeKalb Hosp. Auth.*, 256 Ga. 833, 834 (1), supra. As indicated there, a beneficiary of the public munificence cannot recover from those funds. Nor could he recover from the funds paid for other patients' care and treatment, because he does not, from inability to do so (indigency), contribute to that pool. Compare *Fulton-DeKalb Hosp. Auth. v. Alexander*, 193 Ga. App. 505, 506 (2) (388 SE2d 372) (1989).

The hospital is immune from suit brought by recipients of its charity, to use the words of *Cutts v. Fulton-DeKalb Hosp. Auth.*, 192 Ga. App. 517, 518 (1) (385 SE2d 436) (1989), although it is not immune from suits by all patients. Alexander, supra at 506 (1). *Cutts* held that a patient charged for only a discounted percentage of the actual hospital charges was a recipient of the hospital's charity to the extent of the difference between the actual charges and the much smaller sum which the patient was required to pay. As here, there was no evidence in *Cutts* that the charges were paid or payable from any secondary source.

The question is whether the trial court abused its discretion under OCGA § 24-4-2 in refusing to put the burden of proof on the one who claimed the patient was not a charity patient. The answer is that it did, because as in *Cutts*, the hospital "produced evidence that it had extended its charity to [the patient, so that] the burden shifted to appell[ee] to produce evidence showing that [the patient] came within the exception to the charitable immunity doctrine and that . . . [he] was . . . a 'paying patient' with a secondary source for paying the balance." Id. at 518-519.

The facts with regard to the patient's indigency vel non lie peculiarly within the knowledge of that person. The proof of a person's financial condition is very private. He who claims a special status in society not only is in the best position to prove his qualifications for that status but also should have to prove it because he seeks special

treatment by society. On the other hand, casting the burden on the otherwise-immune charity institution, which must in the opposing view use funds designated for the medical treatment of charity patients to conduct discovery and probe into a patient's personal affairs beyond that necessary to accept him as a charity patient, trangresses the scope of discretion contemplated by OCGA § 24-4-2. Where a non-paying patient, who in the end was the recipient of the hospital's charity, claims he was able to pay and was not a charity patient so that the hospital is contractually bound to him and therefore subject to a negligence claim, he or his personal representative should have to prove it.

2. The error ruled on makes a consideration of the other enumerations of error moot.

It is noted that OCGA § 51-1-29.1, effective July 1, 1987, does not apply to this case.

*Judgment reversed. Pope, J., concurs. Deen, P. J., concurs specially.*

DEEN, Presiding Judge, concurring specially.

I concur fully in the result but am constrained to make the following comments.

As in the instant case, there was no evidence in *Cutts v. Fulton-DeKalb Hosp. Auth.*, 192 Ga. App. 517 (385 SE2d 436) (1989), that the charges were paid or payable from any secondary source. In the instant case, however, unlike *Cutts*, there was conflicting evidence, at the time the motion for summary judgment was argued, as to whether decedent would qualify as a "paying patient" and, under *Morton v. Savannah Hosp.*, 148 Ga. 438 (96 SE 887) (1918), would have standing to bring a negligence action.

The evidentiary posture at the time the motion was argued may therefore be summarized as follows:

(1) An agreement, at the time of decedent's entering the hospital, to pay for services rendered may be implied from the fact that, upon one or the other of his admissions to Grady, decedent told the admissions clerk (or "investigator") that he had insurance, thus arguably representing that an insurer would pay for his hospital stay and thereby meeting the first prong of the *Morton* test.

(2) Upon the initial hospital admission decedent told the investigator that he usually earned between $200 and $400 per week (or possibly as much as $1,800 per month); he also stated, however, that during the preceding month he had earned only $500. The investigator then, in accordance with Grady's policy, tentatively assigned an "X" (full pay) and "40" (has insurance) classification pending verification of income; the verification was apparently not completed. This contradictory evidence was presented in connection with the motion for

summary judgment; Grady had not yet obtained the income tax evidence (no returns filed for 1980 — 1983; the 1984 return showed income of only $4,545, with one dependent) which it later presented at trial. Had this evidence been available earlier, it might conceivably have affected the result of the motion for summary judgment; we decline to speculate on this, however. Therefore, at the time the trial court denied summary judgment, there existed a genuine issue as to decedent's ability to pay since his status under the *Morton* test's second prong was still in doubt.

As to the third prong, it is undisputed that the $52.45 bill was never paid. The fact that the hospital billed the insurer named by decedent can of course be construed as evidence that the hospital regarded decedent as a paying patient and expected him, or some person acting on his behalf, to pay for the services rendered. This fact might also be construed as evidence under the second prong, supra, that Grady regarded decedent as a paying patient. The seemingly inconsistent fact that, after the insurer declined to pay the bill, the hospital did not then bill the estate might also be construed as evidence on the second prong, that Grady did not regard decedent as a paying patient, contrary to the inference raised by the hospital's having initially billed the insurer.

Further, as I read the record, it appears that the trial court erred in instructing the jury on the judicially accepted test for determining whether an individual comes within the "paying patient" exception to charitable immunity. According to the record, appellant's counsel requested that the following charge be given: ". . . I charge you under the law that a 'paying' patient is one who is able to pay, agrees to pay and does pay for the medical care and treatment he receives. If you find that the patient in this case does not meet any of these three requirements, then you must find that he is not a paying patient and that he was entitled to reduced-cost medical care from the defendant."[1] This charge was based on *Morton*, supra at 441, where the Supreme Court held that "if one is received as a patient at a charitable hospital, is able to pay, and does pay for . . . services, and there is an injury on account of the . . . negligence . . . of a . . . servant of the institution, a petition alleging damages on account of injuries so arising is not subject to demurrer." Accord *Patterson v. Fulton-DeKalb Hosp. Auth.*, 192 Ga. App. 167, 168 (384 SE2d 205) (1989).

The instruction actually given by the trial court, as recorded in the transcript, is as follows: "I charge you . . . that under the laws of

---

[1] We note that although this proposed charge is basically a correct statement of the *Morton* test, the inclusion in the second sentence of the words "any of" converts the test, stated in the conjunctive in *Morton*, into a series of disjunctive criteria and thereby alters the test. Since the charge was not given, this error is of no significance in the instant case.

this State a paying patient is one who is able to pay, either personally or through insurance, and is not the recipient of the hospital's charity." Even a cursory comparison of the charge actually given with the *Morton* prototype, supra, reveals that the discrepancies are such as to be at best confusing and at worst positively misleading, as well as without foundation in established law. The error in the charge was then compounded in the verdict form given to the jurors: "Understanding that the opposite of a charity patient is a paying patient, has Grady carried the burden of proof by a preponderance of the evidence that on June 2nd, 1985, when health care services were rendered to Joseph Fanning, he was a charity patient?" The ambiguity, incompleteness, and inaccuracy of the jury charge, especially as reiterated in the special verdict form, made the charge prejudicial to appellant.

DECIDED JULY 12, 1990 —
REHEARING DENIED JULY 30, 1990 — CERT. APPLIED FOR.

*Alston & Bird, Robert D. McCallum, Jr., Geoffrey H. Cederholm III,* for appellant.
*William N. Robbins, Joseph A. Maniscalco, Jr.,* for appellee.